Laramore, Judge,
dissenting:
I respectfully dissent on the grounds that, in my opinion, the majority opinion is contrary to the statute, regulations, the facts of record in this case, and the cases decided by this court as far'back as 1932.
Plaintiff’s claim for the period June 1, 1944 to October 1, 1949 is under the provisions of section 4 of the Act of June 16, 1942, 56 Stat. 359, 361. Section 4 defines “dependent,” as used in the Act, to include the mother of the person concerned, providing she is in fact dependent on such person for her chief support.
This court, in construing a similar definition as contained in section 4 of the Act of June 10,1922, 42 Stat. 625, 627, has held that “chief support” means more than one-half of the funds necessary for reasonable support. Geer v. United States, 76 Ct. Cl. 259; Whiting v. United States, 80 Ct. Cl. 662.
This court has also held that the language of section 4 of the 1942 Act, supra, and the Missing Persons Act of March 7, 1942, 56 Stat. 143, as amended by the Act of July 1, 1944, 58 Stat. 679, 680-681, required that the officer claiming the allowances on the basis of a dependent mother must establish *152 that the mother was in fact dependent on him for her chief support during the period covered by the claim. Mills v. United States, 124 Ct. Cl. 782.
Correlating the 'Whiting and Mills cases to the Geer case, chief support would mean more than one-half of the funds necessary for reasonable support. Based on the facts of record in this case, I do not think the plaintiff has sustained the burden of proving that he contributed more than one-half of his mother’s reasonable support.
Furthermore, in the Whiting case, sufra, this court used the following language:
* * * This section of the statute has been construed by the court in many cases in which it has consistently been held that it is incumbent on the officer seeking the benefit of its provisions to establish (1) the reasonable and necessary living expenses of the mother whose dependency is claimed, * * *. [p. 665]
Bearing in mind that the court in the Whiting case, sufra, was construing a similar definition of the term “chief support” to the one contained in the statute here involved, the findings here show “plaintiff has offered no direct evidence of the amount of money actually required by his mother for her reasonable support for any period of the claim.” [finding 81]
The findings of the Commissioner, which are supported by the evidence, further show “there is not sufficient evidence in this case to establish with exactitude the amount of money actually required by the mother for her reasonable support for any period covered by the claim. The evidence does not establish that plaintiff’s mother was in fact dependent on plaintiff for more than one-half of her support for the period June 1,1944 to December 1, 1948.” [finding 27]
Therefore, under these findings, based on the case of Geer v. United States, supra; Whiting v. United States, supra; and Mills v. United States, supra, plaintiff cannot recover in this action.
This is not to say that one cannot generate great sympathy for this Kansas mother. However, the mother is not the plaintiff in this case. Plaintiff was an unmarried full Commander in the U.S. Naval Reserve and serving in that rank at the time of filing his petition in 1956.
*153 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, while serving on active duty in the United States Navy, filed a voucher on December 2, 1944, for increased allowances for his dependent mother in which the following appeared:
1. I certify that I am entitled to the increased rental and subsistence allowances provided for an officer with dependents by reason of the dependency of the below-named person. (Show data for one dependent only.)
Mother — Wilhelmina H. Meyer
RFD #1, Tampa, Kansas
Certificate filed in accordance with Navy Dept. Ltr. L16-7 (2) (OB) (S&A) of 6 March 1943.
I certxfy that I have contributed to the support of my mother during the period since 1 June 1944 an average of $41 per month in cash or its equivalent, without any consideration in return, which contribution represents her chief source of support, * * *
2. On December 2, 1944, plaintiff also signed a certificate prescribed for use by officers claiming increased allowances on account of a dependent mother or father. This certificate included the following language:
For the purpose of obtaining payment of certain allowances from the Government, and in support of my contention that my mother (father) is in fact dependent on me for her (his) chief support, I hereby certify that the following statements of fact are true and correct and that I will immediately notify the disbursing officer carrying my accounts of any material change therein:
(1) That my mother is Mrs. Wilhelmina H. Meyer who lives at R.F.D. #1, Tampa, Kansas.
(2) That the amount required for my mother’s reasonable and proper living expenses is from $65.00 to $75.00 per month.
73) That for the period from 1 June 1944 to 1 Dec. 1944, I have contributed to the support of my mother without any consideration therefor or hope or expectation of return therefrom, the sum of $250.00.
(4) That the total gross income of my mother from all sources (including in such income any payment or con *154 tribution of others toward her proportionate share of household or living expenses) other than my contributions has not exceeded and does not exceed $25.00 per month or $300.00 per year for the period from 1 June 1944 to 1 Dec. 1944.
(5) That the living expenses actually incurred by my mother during the period from 1 June 1944 to 1 Dec. 1944 amount to from $65.00 to $75.00 each month.
3. On December 8,1944, plaintiff’s disbursing officer transmitted plaintiff’s voucher and certificate to the Comptroller General of the United States requesting a decision as to whether he was authorized to credit plaintiff with allowances for an officer with a dependent mother from June 1, 1944. The Comptroller General advised the disbursing officer in decision B-46211 dated January 1, 1945, in material part as follows:
It appears from the officer’s certificate of dependency dated December 2,1944, submitted with your letter, that his mother was in fact dependent on him for chief support during the period from June 1, 1944, to December 1,1944, the concluding date of said certificate. Accordingly, payment of allowances to Lieutenant Meyer as for an officer with dependents (mother) will be passed to credit, provided he is otherwise entitled thereto, for that period and thereafter so long as there is shown to be no material change in the dependency status of the mother.
4. Plaintiff’s mother was bom in Germany in 1873 and his father was born in Germany in 1875. The father came to the United States in 1892. He returned to Germany in 1898 to bring back a spouse and married her in Baltimore that year. They bought two farms in Kansas where they lived raising a family of 12 children. Plaintiff was the tenth child. The property has at all times been mortgaged and is “rundown.” The petition recites and plaintiff’s testimony supports the allegations that his father, a heavy drinker, has not worked for many years; that his mother is unable to speak, read, write or comprehend the English language; that nine of the children never progressed beyond grade school; that the other three, including plaintiff, received good educations; and that since about June 1,1944, plaintiff is the only child who has been able to contribute financially to help *155 bis parents. Two adult brothers who have remained on the farm are mentally and physically handicapped. Most of the children were required by the father to work on the farms from early childhood and well into adulthood without any compensation. The father’s bank account for the years 1944-1955 reflects that the balances maintained were very small, at no time exceeding $895.14. The account was frequently overdrawn and he at all times owed the bank on notes due.
5. During the course of an examination of pay and allowance records of unmarried officers, the accounts of plaintiff were examined. Plaintiff was questioned for the purpose of verifying information compiled from pay records as well as to ascertain whether his mother was in fact dependent upon him. The investigation revealed, among other things, that the farm was in the name of plaintiff’s father and that, although plaintiff had been paid additional allowances because of the alleged dependency of his mother, she was not claimed by him as a dependent for income tax purposes but sire was so claimed by his father. It was determined that plaintiff’s mother derived her chief support from sources other than plaintiff and that the mother was not in fact dependent on him within the meaning of the pertinent statutes for the period covered by the investigation, June 1, 1944 to December 31, 1948. Plaintiff’s mother did not reside in his household. The report of the investigation contained the following summary statement:
1. The average monthly living expenses of the claimed dependent and spouse appear to have been as follows:
1944 (7 mos.)_ $277
1945_ 158
1946_ 246
1947_ 352
1948_ 253
2. The average monthly net income of the claimed dependent and spouse, exclusive of amount received from subject officer, appears to have been as follows:
1944 (7 mos.)_ $213
1945_ 91
1946_ 163
1947_ 282
1948_ 189
*156 3. The average monthly contribution of the subject officer to his claimed dependent appears to have been as follows:
1944 (7 mos.)_ $64
1945_ 67
1946_ 83
1947_ 70
1948_ 64
6. On February 28, 1950, plaintiff requested that payment of increased quarters and subsistence allowances be discontinued after that date, pending a determination by the Comptroller General relative to the dependency status of his mother.
7. On May 18, 1951, the Assistant Comptroller General addressed a letter to the Secretary of the Navy sending two copies of the report of investigation referred to in finding 5 and stating that plaintiff had obtained increased rental and subsistence allowance payments by the submission of false certificates that his mother was dependent upon him for her chief support. Cooperation was requested of the Navy in effecting recovery of payments made for the period June 1, 1944 to December 31,1948. It was stated that a report covering dependency status for the period subsequent to December 31, 1948, would follow at a later date. This report is referred to in finding 9 hereafter.
8. On June 21, 1951, the Chief of Naval Personnel addressed a communication to plaintiff enclosing the report of the General Accounting Office, referred to in finding 5, and inviting plaintiff’s comments thereon.
9. On July 26, 1951, the Assistant Comptroller General addressed a letter to the Secretary of the Navy, referring to the letter of May 18,1951, transmitting copies of a report covering the dependency status of the claimed dependent for the period subsequent to December 1948, and requesting cooperation for the collection of improper payments for that period. The payments were made, it was stated, as a result of plaintiff’s false certificates that his mother was dependent upon him for her chief support. The report covered the period from January 1,1949 to February 28,1950, and stated in part:
It was observed that some farm buildings and equipment are in a rundown condition. However, Mr. Meyer, *157 father of the subject officer, stated that his net income from farming operations in recent years, particularly for the years 1949 and 1950, was sufficient to cover the regular living expenses of himself, his spouse (the claimed dependent), and the two adult sons. This statement was substantiated through other reliable sources. He further explained that his income had been such that he reduced the mortgage on his property by $2,000 during the past three years, in addition to his regular repayments. The additional payment was made on August 24, 1948, as verified from records of the Federal Land Bank, Wichita, Kansas. Mr. Meyer also had records indicating that he had reduced another outstanding obligation by $200 in 1949 and $500 in 1950.
*****
Inasmuch as the officer’s mother and father lived together during the period the increased allowance payments were made, the family income is considered as a general fund for the support of both parents. The officer’s father had records and documents indicating that his net income for the years 1949 and 1950 was $6,018.56 and $3,664.81, respectively. Federal income taxes were paid on the above amounts accordingly, which were made on joint returns filed in the name of Gerhard, and Wilhelmina Meyer. The above income is exclusive of the officer’s contribution and the cost or value of milk, beef, pork, poultry, eggs and vegetables produced and consumed on the farm.
* * * Due to absence of records and lack of memory, Mr. Meyer was unable to explain fully the disposition of the difference between the monthly expenses and the average monthly income including the officer’s contribution. However, he did say that the proceeds of the officer’s allotment checks are used by Mrs. Meyer exclusively for paying doctor bills, purchasing medicine, clothing and other household items.

Officer's Dependency Certificates

Certificates of dependency submitted by the officer and considered in connection with this investigation set forth the basis for the officer’s claim as follows:
Date of certificates- 1/1/49 7/1/49
Periods covered- 1/1-6/30/49 7/1-12/31/49
Amount required per month From $85 for dependent’s living ex- To penses
Total income of dependent From $25 mo. for prior 6 months $25 mo.
Amount contributed by offi- From $60 mo. cer for prior 6 months To $60 mo.

*158
Summary of Report

1. The average monthly living expenses of the claimed dependent and spouse appear to have been as follows:
1949_$300
1950 (2 months)- 300
2. The average monthly net income of the claimed dependent and spouse, exclusive of amount received from subject officer, appears to have been as follows:
1949_$501
1950 (2 months)_ 305
3. The average monthly contribution of the subject officer to his claimed dependent appears to have been as follows:
1949___$67
1950 (2 months)_ 60
On the basis of information developed, it appears that the claimed dependent derived her chief support from sources other than the subject officer and was not dependent on such officer within the meaning of pertinent statutes.
10. Plaintiff took exception to the findings of the General Accounting Office as set forth by the Assistant Comptroller General above. He made comments thereon to the Chief of Naval Personnel who transmitted them on March 25, 1952, to the Comptroller General and the latter responded by letter to the Secretary of the Navy on June 3,1953, in pertinent part as follows:
By letters dated May 18 and July 26,1951, there were transmitted to you copies of reports of two investigations made by representatives of this Office in the case of Commander Meyer showing that during the period involved his mother and father, and at least two adult brothers, lived on a farm near Tampa, Kansas, and indicating that the mother was not in fact dependent on the officer for chief support.
At the time of the first investigation the officer requested and was granted permission to submit such evidence as was available in support of his contention that his mother was dependent on him, and now has submitted the statements enclosed with the aforesaid letter of March 25,1952. The officer originally argued, in substance, that the initial credit in his account was made only after authorization by this Office in decision B-46211, dated January 1, 1945; that the father fur *159 nished the mother only the bare necessities of life, hence, the need for his contributions and that the parents’ annual net income was less than that disclosed by the investigations, which it was proposed to establish by filing amended income tax returns for the years involved claiming a greater depreciation on the farm in an effort to show a reduced annual net income. Also, that the amount of his contributions was greater than that indicated, since in addition to the amount of an allotment from his pay, he had made substantial contributions for the benefit of his parents, including the amounts of checks which he explained were drawn to meet mortgage payments and a check which is described as having been deposited as a trust fund for emergency use in case of death or hospitalization of his parents and three of his brothers then living and working on the farm. The officer’s latest contention is to the effect that during the period he was credited with increased allowances the parents had no income inasmuch as the farm actually was operated at a loss in view of an unpaid obligation of $67,500, representing back wages due his brothers for work performed on the farm without compensation, that the amount of the family living expenses were overestimated at the time of the investigations, and that since the amount of his contribution was in excess of one-quarter of the family living expenses, the mother was in fact dependent on him for chief support.
With regard to the officer’s contention respecting the decision of January 1, 1945, said decision was rendered on the basis of his unsupported ese parte representations, which representations upon subsequent investigation were found to have been incorrect, consequently, the said decision may not be treated as conclusive of his rights in the matter. As to the officer’s other contentions, since his mother and father lived together during the period increased allowance payments were made, the mother’s dependency status must be considered on the basis of the family unit and the family income must be considered as a general fund for the support of both parents. Hence, while an officer may claim increased allowances on account of either, or both, parents, neither may be considered as in fact dependent on the officer for chief support where the family income is more than one-half of the living expenses of the family unit, and any contribution received by the mother from the officer in such cases must be considered as a contribution for purposes other than as a contribution for chief support. Under the said rules, and assuming that the parents expended
*160 all of tbeir income for living expenses, including tbe amount of the officer’s contributions, less the amounts of the above-described checks, which may not be viewed as contributions for current support, and giving him the benefit of other alleged check contributions but not the depreciation claimed or to be claimed as an income tax deduction, or the alleged unpaid obligation of his father for back wages due his brothers — since such items in no way affected funds available and actually used for support purposes — the following would appear to reflect the family situation:

It will be noted from the foregoing tabulation that during the entire period involved the family cash income available for support was more than one-half of the family living expenses — including the living expenses of the officer’s brothers living at home and working on the farm, but exclusive of the value of such subsistence as the family may have obtained directly from the farm. Hence, the conclusion appears required that the mother was not in fact dependent on the officer for chief support during the period the increased allowance payments were made to the officer, regardless of the amount of his contributions.
Accordingly, further consideration by the Department of the Navy with a view toward recovery of the full amount of the increased allowance payments made to Commander Meyer on account of his mother for the period in question, and information as to the amount collected, will foe appreciated.
11. On November 30,1954, plaintiff requested the Chief of Naval Personnel to appeal to the Comptroller General to reconsider his adverse decisions in plaintiff’s case, submitted in support thereof 12 typed pages, single spaced, of a justification of his position, and attached numerous supporting exhibits illustrating conditions on his parent’s farm. Plain *161 tiff requested, also, that the Navy Department make an investigation of his case and determine his right to allowances for a dependent parent. No such investigation was made. The Navy informed plaintiff that it was without adequate facilities to do so.
12. In paragraphs 8 and 9 of his communication of November 30,1954, plaintiff made reference again to the unpaid services of his adult brothers on the farm as an indication that there was actually less money available to his parents than the defendant represented. He said in part:
8. Further, it must be obvious that the two or three brothers who always lived at home and worked on the farm during the period in question and who had no outside income, no real property, no other wealth, nor hardly any money of their own, must have had something to eat and clothes to wear, which was derived from the income of the farm. Consequently, without any doubt whatsoever, there was far less money available for the livelihood of my parents than that set forth in the General Accounting Office reports. Attention is invited to the fact that my brothers never have had the good fortune to have to file income tax returns despite being single and their long hours of hard work on the said farm, with its obsolete equipment and deteriorated buildings. * * *
9. Obviously if the brothers who worked at home for wages they did not receive had not been there, my father then would have had to hire farm hands which he would have had to pay, but which he would not have been able to fully pay at the average prevailing wage rates; or if he paid such farm hands all of the money available from the farm to partly meet the normal compensation usual for such occupation which is a farm expense and which would be deducted from the farm’s income, then there would have been no money at all available for my parents’ limi/ng expenses nor for that normally required and consumed off the farm income by such farm hands who also would have had to be fed solely for the convenience of their employer. In my opinion the living expenses consumed by the brothers for their livelihood represents a direct cost of the operation of the farm. As evidenced by the enclosures hereto, I feel that it can be considered that the brothers at home represented nothing more than “powered machinery requiring fuel and oil and protection from the weather in order to operate properlyor, that they represented “workhorses requir *162 ing hay and oats and shelter in order to be able to work.” From the two analogies just mentioned it can be considered that the money spent on the brothers for their livelihood, maintenance, etc., represented nothing more than farm operating expenses which are normally deducted from or offset against the income of the farm, leaving a proportional less amount of money available for my parents’ living expenses for each such additional member at home. The foregoing is precisely the manner in which my brothers were performing their labor at home. * * * [Emphasis supplied by plaintiff.]
13. On May 20, 1955, the Comptroller General, having considered plaintiff’s letter and supporting documents of November 30, 1954, referred to above, advised the Secretary of Navy in part as follows:
* * * His [plaintiff’s] one material allegation, however, that for each of the years involved his father reported for income tax purposes a net income substantially in excess of his actual net income, is not supported by any competent evidence, except copies of refund notices for 1949 and 1950, and for those two years it is not shown that the father’s actual net income was less than the officer’s contributions. The matter has been carefully considered but no reason is found to change the conclusion reached in the decision of June 3,1953. Accordingly, a debt settlement will be issued by our Claims Division certifying the amount of Commander Meyer’s indebtedness to the United States on account of the increased allowances paid to him during the period June 1, 1944, to February 28, 1950, because of the claimed dependency of his mother. A copy of the debt settlement will be sent to you, and the assistance of your Department in effecting recovery of these illegal payments will be appreciated.
14. On January 16, 1956, a certificate of indebtedness of plaintiff to the United States was issued by the Comptroller General which read in pertinent part as follows:
I certify that I have examined and settled the claim(s) of the United States against you and find there is due the United States the sum of $8,142.30, representing erroneous payment of increased rental ($6,382.50) and subsistence _ ($1,759.80) allowances, incident to service as a commissioned officer, U.S. Naval Keserve, service No. 144860.
*163 On the basis of certificates of dependency executed by you, that your mother was dependent upon you for her chief support, you were paid increased allowances as an officer with dependent, during the period June 10,1944 through February 28, 1950, in accordance with the provisions of the Pay Readjustment Act of 1942, dated June 16,1942, 56 Stat. 859, effective June 1, 1942, as amended 37 TT.S.C. 105, 106 (1946 ed.), and of the Career Compensation Act of 1949, dated October 12, 1949, 63 Stat. 802, effective October 1, 1949, as amended.
It is determined that you were not the chief support of your mother, since dependency status is considered on the basis of the family unit and' the family cash income available for support was more than one-half of the maximum family living expenses. Based on the financial data furnished, it is established that your mother was not, in fact, dependent upon you for the major portion of her support, in accordance with the requirements of the cited acts.
15. A copy of the certificate of indebtedness was transmitted to the Secretary of the Navy by the Comptroller General. On May 21,1956, the certificate was transmitted by the Comptroller of the Navy to plaintiff’s commanding officer with the advice that under the provisions of Public Law 497 the debt could be liquidated in an amount not to exceed two-thirds of plaintiff’s pay and that the $8,142.30 could be paid in monthly installments of not less than $150. Such collection started on June 1,1956, and the debt was fully collected on July 1,1960, in the sum of $7,626.75. A credit of $515.55 had been allowed plaintiff for reasons not material here. The recoupment was for the period June 1,1944 to February 28,1950. The recoupment, not having been completed at the time defendant filed its answer, was made the subject of a counterclaim.
16. On April 10, 1956, plaintiff filed his petition in this case under the provisions of the Career Compensation Act of 1949, seeking the recovery of increased allowances for quarters and subsistence, because of a dependent mother, for the period March 1,1950 to April 10, 1956. During the course of the trial plaintiff specified that he would claim from March 1, 1950 through December 31, 1955. Thereafter he asked leave to amend to claim for the entire period June 1, 1944 through December 31,1955. Plaintiff was permitted to offer *164 proof on the basis of the latter period but has not complied with rule 18(e). Defendant’s answer denies the material allegations of the claim and asserts affirmative defenses of laches, the statute of limitations, failure to exhaust administrative remedies and makes a counterclaim for the sum since recouped from plaintiff’s pay, as noted above in finding 15.
17. At no time material herein did plaintiff’s mother actually reside in plaintiff’s household.
18. In a letter dated May 25, 1956, the Chief of Naval Personnel stated in part:
Ref: * * *
(b) Dep. Assistance Act of 1950, Public Law 771, 81st Congress
(c) NavCompt Manual 044038-lb (8)
# fN # * *
3. It is noted that the period during which Commander Meyer alleges his mother was dependent upon him for over one-half her support is 1 March 1950 to 10 April 1956. The records of the Bureau of Naval Personnel reveal that Commander Meyer has never applied to the Chief of Naval Personnel for increased subsistence and quarters allowances as for an officer with a dependent mother for the period covered by his petition. Inasmuch as references (b) and _(c) authorize the Navy Department to determine the eligibility of its members to receive increased allowances on the basis of dependent parents and describe the procedures for requesting such increased payments, it would appear that subject officer has never availed himself of the administrative procedures required to obtain a determination from the Navy Department of his entitlement to increased allowances on the basis of a dependent mother.
Plaintiff relies upon his statement in his communication of November 30, 1954, to the Chief of Naval Personnel, referred to above, wherein he asks that the Navy investigate his claim and pay him for the support of his alleged dependent. It has been previously found that on February 28, 1950, plaintiff requested that the payments be stopped pending a determination by the Comptroller General on disallowance of payments made to that date. Plaintiff, however, has at all times insisted that the dependency has continued, although technical compliance with the law and regulations *165 cited above is sought to be satisfied only by the communication of November 30,1954, which, was on. the general issue of dependency and specifically for the period prior to February 28, 1950. No dependency certificate as specified by Navy regulations has been filed by plaintiff for any subsequent period.
19. Prior to August 1, 1950, the effective date of the Dependents Assistance Act of 1950,64 Stat. 795, the Comptroller General uniformly applied the so-called “family-unit rule” in determining the dependency status of claimed dependents, where, as herein, the mother and father resided in the same household. The rule, as stated in certified copies of unpublished decisions of the Comptroller General received in evidence in this case, is as follows:
Where, as here, the mother and father reside in a common household, the dependency status of the mother or father is for determination on the basis of a family unit, and the family income ordinarily must be considered as a general fund for the support of the parents.
The regulation cited in the Navy Comptroller Manual, paragraph 044038-lb(8), referred to in finding 18, reads in part:
* * * When the father and mother of an officer are living together, the dependency status of the mother and/or father is determined on the basis of a family unit, and the gross family income from all sources must be considered as a general fund for the support of the parent claimed as a dependent. * * *
As noted in finding 10, the Comptroller General advised the Secretary of the Navy that “while an officer may claim increased allowances on account of either, or both, parents, neither may be considered as in fact dependent on the officer for chief support where the family income is more than one-half of the living expenses of the family unit * *
It is provided in section 102(g) of the Career Compensation Act of 1949, 63 Stat. 802, that the “term ‘dependent’ * * * shall include the father or mother of such member provided he or she is in fact dependent on such member for over half of his or her support.” The family-unit rule is not expressly provided in the statute. It is a matter of regulation. Such a regulation should or should not be applied *166 depending on the circumstances and facts of the individual case and should not be a matter of arbitrary application.
20. In the year 1944 the net audited income of the Meyer farm was $2,191.08. If the amounts used for the mother’s subsistence during that year were calculated as representing one-fourth of the total farm income, this share would have amounted to $548.63. One-half of that sum, representing Mrs. Meyer’s share under the family-unit rule, was $1,095.54. This does not allow anything under such application of the rule for salaries to the two adult children who were working on the farm at the time. No salaries were paid them for their work which contributed to the farm income. Further, plaintiff’s contributions were not included in the figure of $2,191.08.
It is found that plaintiff’s contributions to the support of his mother for the applicable period in 1944 did not exceed her share of income available under the “family-unit rule” for her support. But if the amount so used for her subsistence was materially less than half the total income from the farm, then plaintiff’s contributions for the period June 1, 1944, to the end of the year, as shown by the Comptroller General’s report, would amount to more than the actual sums otherwise used for her support.
21. In the year 1945 the net farm audited income of Mr. and Mrs. Meyer was $395.05. Their joint Federal income tax return listed total net income of $391.05. The figure of $395.05 is agreed upon by the parties. Under the family-unit rule Mrs. Meyer’s share of the income was $197.53. Under this allocation nothing is allowed for any adult children living on the farm. They received no wages. For 1945 there are in evidence canceled checks to cash and to his father in the total sum of $666.76 which plaintiff says were for his mother. Plaintiff claims he made an additional contribution of $100 in cash in 1945.
It appears from the evidence that in 1945 plaintiff contributed more than one-half of the family-unit net income from the farm.
22. In January 1946 plaintiff made an allotment of his pay to his mother in the amount of $60 per month. In addition *167 to this allotment in the total amount of $720 for 1946, plaintiff purchased for his mother an electric range costing $210.76 and an oil heater costing $67.90. Excluding them and making no allowance for the adult brothers on the farm, the family net income of $1,958.82 exceeded one-half the estimated family expenses for 1946. Plaintiff’s allotment of $720 was less than the mother’s one-half share of the family-unit income or expenses. These are the income and expense figures developed by the General Accounting Office investigations reported in findings 5 and 10. However, the schedules filed by the parties in this case reveal that the family net farm income for 1946 was $1,338.54 of which the mother’s one-half under the family-unit rule would be $669.27. Plaintiff’s contribution by allotment slightly exceeded the mother’s share of family-unit income and on this basis was 52 percent of the total income.
23. In 1947, in addition to the contribution of $720 by allotment from plaintiff’s pay, he contributed $120 for the support of his mother, for a total of $840. The agreed-upon family net income from the farm that year was $2,674.49. The mother’s share of this income under the family-unit rule, again excluding the adult children who were paid no wages although living on the farm, was $1,337.25. Plaintiff’s contribution to the mother’s income was 38.6 percent of the total of $2,177.25 which she received or which was available to her under the rule. Assuming the family living expenses in 1947 were $4,218.76, as shown by the GAO report, the family income was more than one-half thereof.
24. In the year 1948 plaintiff’s allotment to his mother was $720 to which he added $50 by check. The net farm audited income that year was $2,206.34. Under the family-unit rule the mother’s share of the income from the farm was $1,103.17. This allocation again excludes the two adult sons living on the farm as is done throughout these findings and reference to which will not hereafter be repeated. They were paid no wages. There is no evidence they had any wage contract. It will be noted that according to the report of the GAO, as set out in finding 10, the family expended each year from 1944 to 1949 substantially more than the total farm income.
*168 Plaintiff, in a letter dated February 29,1952, to the Chief of Naval Personnel, stated, among other things, that “heretofore I have not claimed credit for numerous gifts of cash and living essentials which I made to my mother, from time to time.” The Government failed to take into account numerous unpaid bills that existed every year during the period of the claim.
25. In the year 1949, in addition to the contribution of $720 by allotment, plaintiff also contributed $100 by check payable to cash for the support of his parents and a check for $1,000 made payable to his brother George to be used in behalf of the parents in event of sickness or death. The agreed, audited, net farm income for 1949 was $5,539.97, of which the mother’s share under the family-unit rule was $2,769.99. The parents’ total living expenses in 1949 were $6,838.56. Thus, the family income exceeded one-half of the expenses. Plaintiff’s contribution, excluding the $1,000 which was not for current support and which is not shown to have been expended, was less than one-half of the income or expenses.
26. In the year 1950 plaintiff contributed $500 to his father in addition to his allotment of $720 to his mother. The net farm income in 1950 was $2,659.29. Of this sum, the mother’s share under the family-unit rule was $1,329.65. The parents’ living expenses in 1950 were shown to be $730.80 for the first 2 months, or $365.40 per month. Projected over 12 months, the expenses would be $4,384.80. The joint Federal income tax return of the parents in 1950 lists expenses of $4,790.88, not counting $222.50 in depreciation. As shown in finding 9, the GAO investigation determined the monthly family living expenses in 1950 to be $300 per month, or $3,600 for the year. Thus, the family income exceeded one-half of the total living expenses under any of the three estimates accepted. Plaintiff’s contribution of $1,220 was less than the allocable portion of the living expenses of the mother.
27. There is not sufficient evidence in this case to establish with exactitude the amount of money actually required by the mother for her reasonable support for any period covered by the claim. The evidence does establish that plaintiff’s mother was in fact dependent on plaintiff for more than one- *169 half her support for the period June 1,1944, to December 31, 1948.
28. Defendant’s investigation by the General Accounting Office reveals an estimate based upon information furnished by plaintiff’s father indicating that in 1949 and until August 1950 the average monthly expenses of the family of four, exclusive of an amount for food produced and consumed on the farm, was $300 per month. Using the 1950 Federal income tax return, the average expense would be approximately $400 per month. For the period March 1,1950 (after which plaintiff asked that allotments be suspended) to August 1,1950 (effective date of the Dependents Assistance Act of 1950), the income available for support of both parents exceeded one-half of the living expenses of the family unit for that period, using either monthly estimate of expenses. The evidence does not establish that plaintiff’s mother was in fact dependent on plaintiff for more than one-half of her reasonable support for said period nor did she live in his household.
29. The evidence establishes the following with reference to the years shown:

30.In addition to the above contributions via allotment direct to his mother, plaintiff testified that he made certain other contributions. His testimony is that he contributed $100 in cash in each of the years 1950 through 1954. In 1951 he bought a tractor and plow for use on the parents’ farm and this cost plaintiff $3,264. While not for current support, he has allocated $330 of this cost annually to each of the subsequent years as support money. In 1953 he wrote a check to his father for $350. Plaintiff gave two checks *170 for $500 each to his father in. 1955 and $200 in cash. In 1955 he also bought a television set for his parents, costing $153.38, and a TY antenna for $70. There is no evidence to show exactly how the cash or funds given by check to his father were spent or what portion of the same was used for the mother’s support.
31. The evidence in the record as to the actual living expenses of the mother and the sum required for her reasonable support is meager. The GAO investigation, as heretofore noted, estimated, on the basis of data furnished by plaintiff’s father, that the average family monthly expenses were $300, exclusive of food produced and consumed on the farm. Defendant would allow a cost-of-living increase of 20 percent for the period August 1, 1950 to December 31, 1955. This would aggregate $23,400 for the period at the rate of $4,320 per year. One-half of these sums, representing the mother’s share, would be $11,700 and $2,160, respectively. As shown in finding 29, the net farm income for the same period was $11,816.52, which is an average of $2,181.60 per each 12 months of the 65-month period. On this basis, it is clear that the family income is more than one-half of the living expenses under the family-unit rule and that contributions received by the mother from plaintiff in such a situation must be considered as a contribution for purposes other than for chief support. Assuming plaintiff’s allotment of $3,900 (finding 29) plus $1,800, which is one-half of the alleged contribution in finding 30, all went to the mother’s support, for a total of $5,700, this would be less than one-half ($5,850) of the mother’s one-half ($11,700) of the best available estimate of $23,400 for total living expenses for the period in question.
Plaintiff has offered no direct evidence of the amount of money actually required by his mother for her reasonable support for any period of the claim. On the basis of the weight of the evidence, it is found that while plaintiff was generous to and considerate of the welfare of his parents, his mother was not, in fact, dependent upon plaintiff for more than one-half of her support for the period August 1, 1950 to December 31,1955. Further, the family income was more than one-half of the living expenses of the family unit.
*171 32. For convenience, the following table will serve to illustrate, in summary, the total picture of net farm income as stipulated by the parties for the years in 1944 to 1948, as well as the projected shares of the alleged dependent’s part of that income and living expenses and plaintiff’s contributions direct to his mother. Other contributions which were not direct to his mother, but from which she undoubtedly had some benefit, are described elsewhere in the findings. It will be seen that under defendant’s application of the family-unit rule the total family farm income exceeded one-half the defendant’s own estimate of total family living expenses of the family of four. Other applications of the figures achieve different results. For example, plaintiff’s contribution in each of the years substantially exceeded one-fourth the family income and in two of the years exceeded the total family income.

The above table is based upon defendant’s own reports and computations. It is significant to note that the farm was in the father’s name, and that he controlled the income. Further, there is no direct evidence that any substantial portion of that income was used for the mother’s support. A reading of the entire record compels the conclusion that the mother received less than even one-quarter of whatever the actual farm income may have been.
CONCLUSION 03? LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover the allowances *172 claimed for the period June 1, 1944, to December 31, 1948, and judgment will be entered to that effect, with the amount of recovery to be determined pursuant to Rule 38(c).
It is further concluded that plaintiff is not entitled to recover for the period from January 1,1949, to July 31,1950, and his petition as to that portion of his claim is dismissed.
It is still further concluded that plaintiff is also not entitled to recover for the period from August 1,1950, through and including December 31, 1955, and his petition as to that portion of his claim is dismissed without prejudice. Defendant’s counterclaim is dismissed.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on June 15, 1962, that judgment for plaintiff be entered for $6,107.50.